### UNITED STATES v. STONE & DOWNER CO.

(Circuit Court of Appeals, First Circuit. December 20, 1909.)

#### No. 834.

**1.** APPEAL AND ERROR (§ 724*)—ASSIGNMENT OF ERRORS—SUFFICIENCY—PLAIN ERROR.

One of the several contentions urged by the appellant on argument was based on an assignment of error that merely negatived the entire result in the court below. *Held,* that under the settled practice the assignment was in this case too general, though it might have been overlooked if there had been a plain error.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2997–3001; Dec. Dig. § 724.*]

**2.** COURTS (§ 96*)—DECISION—STARE DECISIS—COURTS OF CO-ORDINATE JURISDICTION.

A Circuit Court is justified in following the decision on the same topic by the Circuit Court of another district, whether or not it fully approves that decision.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 325, 327, 328; Dec. Dig. § 96.*]

3. CUSTOMS DUTIES (§ 24*)—CLASSIFICATION—"ALCOHOLIC COMPOUNDS."
     In Tariff Act July 24, 1897, c. 11, § 1, Schedule A, par. 2, 30 Stat. 151 (U.
S. Comp. St. 1901, p. 1626), the term "alcoholic compounds" includes a
mixture of fine-cut herbs and alcohol, in which the alcohol mainly serves
as a 'preservative in the importation of the leaves, but continues in use
after importation, for the purpose of producing a tincture, although there
might be no justification for holding that the purpose of using the alcohol
as a mere preservative determines classification under this provision.
     [Ed. Note.—For other cases, see Customs Duties, Cent. Dig. § 31; Dec.
Dig. § 24.*
     For other definitions, see Words and Phrases, vol. 1, pp. 295, 296; vol.
8, p. 7570.]
4. CUSTOMS DUTIES (§ 24*)—"COMPOUND."
     In Tariff Act July 24, 1897, c. 11, § 1, Schedule A, par. 2, 30 Stat. 151
(U. S. Comp. St. 1901, p. 1626), relating to alcoholic compounds, the word
"compound" is not limited by any trade usage or technical adaptation, but
is used in its common broad sense of being any union or mixture of ele-
ments, ingredients, or parts, as fine-cut herbs commingled with alcohol
and constituting to some degree an infusion.
     [Ed. Note.—For other cases, see Customs Duties, Cent. Dig. § 31; Dec.
Dig. § 24.*
     For other definitions, see Words and Phrases, vol. 2, pp. 1372, 1373.]

Appeal from the Circuit Court of the United States for the District
of Massachusetts.

For decision below, see 171 Fed. 293.

D. Frank Lloyd, Deputy Asst. Atty. Gen. (Martin T. Baldwin, Sp.
Atty., of counsel), for the United States.

Walden & Webster (Henry J. Webster, of counsel), for appellee.

Before PUTNAM and LOWELL, Circuit Judges, and ALDRICH,
District Judge.

PUTNAM, Circuit Judge. This appeal depends on the construc-
tion of the following portions of the Tariff Act of July 24, 1897 (Act
July 24, 1897, c. 11, § 1, Schedule A, par. 2, 30 Stat. 151 [U. S. Comp.
St. 1901, p. 1626]):

"2. All alcoholic perfumery, including cologne water and other toilet waters
and toilet preparations of all kinds, containing alcohol or in the preparation of
which alcohol is used, and alcoholic compounds not specially provided for in
this Act, sixty cents per pound and forty-five per centum ad valorem."

Also on that portion of the sixth section which imposes a duty of 10
per cent. ad valorem, which section is as follows:

"Sec. 6. That there shall be levied, collected, and paid on the importation of
all raw or unmanufactured articles, not enumerated or provided for in this act,
a duty of ten per centum ad valorem, and on all articles manufactured, in
whole or in part, not provided for in this act, a duty of twenty per centum ad
valorem."

It is true that at bar the United States claimed to rest alternatively
on that portion of the sixth section which imposes a duty of 20 per cent.
ad valorem; but the assignment of error on which it relies for this
merely negatived the entire result in the Circuit Court. Therefore it
was altogether too general under the settled practice in reference to
such assignments, although, of course, if there had been a "plain er-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ror" in this connection, we might have overlooked this defect. We, however, reach a satisfactory conclusion without regard thereto.

The decision of the Circuit Court rested the case on the 10 per cent. ad valorem duty under section 6. That court, however, expressed no opinion itself on the topic, but merely followed the Circuit Court for the Second Circuit in Boericke & Runyon Company v. United States, 126 Fed. 1018. This it clearly was justified in doing, whether or not it fully approved that decision. On the other hand, being a decision only of the Circuit Court, it does not stand as an authority binding us.

The facts in reference to the nature of the importation were correctly and sufficiently stated by the Board of General Appraisers as follows:

"Upon the evidence taken it appears that 15 kilograms of alcohol, valued at marks 37.50, was placed in the kegs containing certain belladonna leaves and stalks cut up and 12 kilograms of alcohol valued at marks 30 in the kegs containing aconite leaves and stalks cut up, and that these values were included in the general value on the consular invoice; that the merchandise consists of green belladonna leaves and stalks and green aconite leaves and stalks imported for the purpose of maceration in alcohol and for the purpose of making tinctures and extracts; that the alcohol in which the leaves were first immersed was continued in use in the maceration in this country while it incidentally served as a preservation in the importation of said leaves by which the amount of alcohol so used lessened the quantity of alcohol required for complete maceration."

It was agreed at our bar that the alcohol during the process of importation absorbed sufficient from the leaves and stalks described to poison it, and to prevent any profitable attempt to extract the poison from it, or to thus reduce it to its normal condition. Nevertheless the opinion of the learned judge of the Second circuit in the case cited, at page 1019 of 126 Fed., described the alcohol as a "mere vehicle" of no more importance than the cask in which packed. The opinion said alternatively that the importation consisted of the leaves and stalks and the alcohol "as the factors in a loose and temporary association for the purpose, as aforesaid, of maintaining the stalks and leaves in their natural condition, and fit to subserve their intended use." Apparently these observations express a condition differing from the facts as they appear before us; because, if the alcohol had been a "mere vehicle," if it formed with the leaves and stalks only a "loose and temporary association," it would have come into the country as alcohol or spirits, subject to a duty of at least $2.25 a proof gallon according to paragraph 289 of the act in question, with possibly an additional ad valorem duty on account of the leaves and stalks which were in the package with it. Of this there is no suggestion in any discussion concerning this importation brought to our attention. Moreover, that in the case before us the alcohol was not a "mere vehicle" is evident from the use to which it was finally put. Unlike any ordinary vehicle, whether cask, carton, wrapper, or whatever it may be, or any ordinary preservative, there was usually no attempt to separate it from the leaves and stalks, but further alcohol was generally added to it for the purpose of completing the whole into a tincture. The whole process is described in substance and without question as follows: When the package is made up at the place of shipment, the leaves are chopped into fine pieces, and the alcohol commingled with

them. After importation the leaves are further manipulated in the way of maceration, and further alcohol added for the purpose of further extracting the virtue from them, until, as the result of the further maceration and the further addition of alcohol, the tincture, the attaining of which was the purpose for which the importation was made, is extracted, ready for the market or for use.

It is true that the testimony also shows that the tincture is not the only form in which the result of the importation is put on the market. Another result is a tablet as to which the alcohol is a hindrance, but it is admitted that the major portion is used in the tincture form. All this constitutes a process of either a chemical union or an atomic association, continuing from the beginning at the place of exportation until the tincture is complete, ready for the market. The fact that in some part the tablet takes the place of the tincture does not change the nature of the process which we have described; and its nature must be determined from all the uses to which the product resulting therefrom can be applied.

The topic of compounds with spirits, including alcohol, first came into the tariff statutes in Act July 28, 1866, c. 298, 14 Stat. 328. There it appears as follows:

"On all compounds or preparations of which distilled spirits is a component part of chief value, there shall be levied a duty not less than that imposed upon distilled spirits."

This is repeated in Act March 3, 1883, c. 121, § 6, Schedule H, 22 Stat. 505. It also appears substantially in the act of 1897. It has no application here, because the alcohol in this importation was both by weight and measure a minor quantity. This word "compound," however, quite early came under consideration. In Treasury Decisions 3,672, of July 27, 1878, a small percentage of alcohol mixed with cherry juice for the purpose of preventing fermentation was held not to establish the cherry juice as being an alcoholic compound. In that case "fruit juice" was specifically classified, so that, notwithstanding the addition of the alcohol, it was ruled that it still held that classification. The same rule might apply here if there had been a special classification of compounds of belladonna or aconite.

On April 27, 1883, by Treasury Decision 5,682 a more important ruling was made. The importation was therein described as an infusion. It was said that it was not a recognized medical preparation, but beyond that nothing was explained in reference to it except only that distilled spirits were the component part of chief value. It was held to be a compound within the classification of "compounds or preparations," etc. The mere fact that the importation could not be classified specifically seemed to be sufficient to justify classifying it generally as a compound. This decision is cited in Adams' Tariff (2d Ed. 1890) 67, where the importation is described as an alcoholic infusion. The word "infusion," as applied here, according to Webster's Dictionary—that is, as used in pharmacy—is the "act or process of steeping or soaking any substance in water in order to extract its virtue." In addition to this, it covers the extract obtained by infusion. Whatever the meaning of the word "infusion," this decision was plainly rested on the broad meaning of the word "compound," because it did not investi-

gate either the precise nature of the importation or the use to which it was put. It classified it as a "compound" simply because it was not known as a medical preparation. This is, therefore, an early, broad, contemporaneous interpretation of the word "compound" which agrees entirely with its popular use, the broad use of the word.

Of course, the word "compound," under some circumstances, has a limited application. Pharmacists ordinarily apply it to a mere mixing of different substances, especially when comminuted with the mortar and pestle. Chemists sometimes, though not ordinarily, use it when two substances are chemically united so as to make a new substance; but, according to the lexicographers, and according to well-known understanding, it covers any "union or mixture of elements, ingredients or parts." Webster's International Dictionary (1904), the word "compound." In view of the fact that, except as applicable to certain specific medical preparations where it has a special narrow use, the word "compound" has no particular commercial limitation, there is no reason why it should not be interpreted here in its broadest sense, according to its natural meaning as commonly understood. There is all the more reason for this because any limitation on the expression under discussion, wherever found in the customs statutes in connection with spirits, would open an opportunity for evading or avoiding the purpose of the revenue laws, both the internal revenue laws and the customs laws, contrary to the evident general intention to levy a high duty, at least for once, on all spirits whether of domestic or foreign production. Moreover, in no other way can the word "compound," when linked with "preparation," have any appreciable effect.

Independently of the infusion into the alcohol of the virtues of the belladonna and the aconite partly accomplished on arrival at the port of importation, even without which the commingling of the two elements might well be called a "union or mixture" according to lexicographers, yet in every sense the result of the infusion constitutes clearly a compound in, as we have explained from the lexicographers, the broad definition of the word. Therefore we have the following decisive elements: First, the broad definition of the word "compound," which, as applied here, is not limited by any trade usage or technical adaptation; second, we have in the mere commingling of two elements of the spirits on the one hand and the leaves and stalks of belladonna and aconite finely cut on the other hand, independently of infusion, a "compound" if it were necessary to leave the case there; third, we have an infusion which is of such a character that it does not result in a chemical change, and leaves the alcohol still alcohol, although in a deteriorated condition; fourth, whatever may be said about the mere assembling of the different elements, this infusion, under the circumstances established, marks the existences of a compound; and, fifth, as this infusion commences to be operative from the time the elements are assembled in the country of exportation, and this continues during the voyage, with assistance after arrival of further added alcohol, until, for at least certain purposes, a "tincture" in the strict sense of the word results, it seems to us clear that we have an importation of a compound of such a character and such a continuous history that it relates back to its beginnings at the time of shipment.

Therefore, in any view, it is clearly within that part of paragraph 2 under discussion which covers "alcoholic compounds not specially provided for in this act."

In order that we may not be misunderstood, we will state again that we comprehend thoroughly the facts that the whole product is not completed in the form of a tincture, and that the first use of the alcohol is mainly for the purpose of holding in a sound condition the leaves and stalks of the belladonna and aconite. Nevertheless, we cannot perceive anything in the statute which justifies us in holding here that the primary purpose of using the alcohol as a mere preservative determines the classification, although in some cases it would. On the other hand, the fact is that the importation is an infusion to a greater or less degree, and therefore it is covered by the peremptory terms of paragraph 2, although under some other paragraphs the purpose of the importation, and not the mere fact of the nature of the article imported, might more or less determine the classification.

The judgment of the Circuit Court is reversed, and the case is remanded to that court, with directions to render a judgment in favor of the United States.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes